IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**EVELYN STEVENS**     **PLAINTIFF**

**V.**     **NO. 3:20-CV-81-JMV**

**COMMISSIONER OF SOCIAL SECURITY**     **DEFENDANT**

**MEMORANDUM OPINION**

This matter is before this court for judicial review of a January 22, 2021, Administrative Law Judge (the "ALJ") decision of "Unfavorable" on claimant's application for Social Security Disability Insurance Benefits under the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq*. The Appeals Council denied review of the decision. Thus, the ALJ's January 22, 2019, decision stands as the Commissioner's final decision. For the reasons discussed at a hearing on the matter on April 12, 2021 and set forth below, the case is reversed to be re-examined in accord with the directives below.

The relevant facts, including extensive medical history, have been set forth on the record on prior occasions. They are repeated herein (with emphasis added), where necessary, as background or to illustrate a point.

The claimant was born on March 19, 1962. She filed for disability on December 29, 2016, alleging an onset date of January 14, 2016. She claimed the following impairments of relevance here: Spine disorders, depression, migraines/headaches, and related sequela[1] (hereinafter, collectively "headaches").

Following a hearing before the ALJ on September 14, 2018, at which the claimant and a vocational expert testified, the ALJ rendered a decision dated January 22, 2019, finding claimant

---

[1] Claimant's headaches/migraines were repeatedly noted to be associated with dizziness, nausea, light sensitively, neck pain and no or limited range of motion of the neck and head.

to have severe impairments of spine disorder and depression, while finding, of relevance here, that her headaches were a non-severe impairment stating they were "managed medically and did not significantly limit [her]. . . ability to work." (T. 13).

Ultimately, the ALJ found that the claimant had the following residual functional capacity ("RFC"): "claimant [can] perform medium work except [she] is never able to climb ladders, ropes or scaffolds and she is further limited to simple, routine and repetitive tasks." (T. 16)

Claimant asserts, as reversable error, the ALJ's failure to find her headaches to be a severe condition and resulting prejudice therefrom – an error compounded by the ALJ's reliance, in assessing her RFC, on non-examining DDS physicians whose assessments were made early on and contradicted the findings and opinions of the physicians, including specialists, who did exam and/or treat her for two years after she was released to return to light to medium work in July 2016.[2]

**Analysis**

In support of her appeal, claimant notes that though the ALJ recited from a significant number of entries in the claimant's extensive medical records relating to her headaches, he did not explain how he arrived, based on those numerous entries, at the seemingly illogical conclusion that the claimant's headaches were "effectively managed with medication and did not significantly limit her ability to work." (T. 13) Indeed, the only reference to even a fleeting improvement in claimant's headaches was in a nurse practitioner's entry on September 22, 2017, stating that claimant "told Nurse Practitioner Jenkins that her headaches had improved and that they had reduced in frequency" and that "NP Jenkins opined that Plaintiff's medication 'have worked well to keep headaches and neck pain controlled.'" (T. 33). In contravention of the same, the claimant

---

[2] The claimant also assets that the ALJ failed to consider a closed period of disability. This argument is without merit for the reasons set out in the Commissioner's brief.

points to the overwhelming record of medical care rendered to and medications prescribed for her, for the relevant period (January 14, 2016 to July 10, 2018), by specialists to treat her recurring headaches and related sequela despite medications, much of which occurred after the aforementioned nurse practitioner's note.

The medical records reflect that claimant suffered two injuries to her head/neck – one in 2015 and one in early 2016. She was ultimately referred by workers' compensation to Dr. Olinger, a neurosurgeon, for treatment of these and he performed surgery on her neck in March of 2016. By August 17, 2016, the claimant was still undergoing sessions of physical therapy and "still had difficulty with head motions, neck pain and numbness and tingling rating down her left arm." (T. 29). She also "reported worsening left arm numbness when she lay down at night and continued to have complaints of not being able to look up, turn her head to look over her shoulder while driving and being able to reach overhead." *Id.* The physical therapist indicated that the claimant "might benefit from the use of the TENS unit to help control pain, but that the claimant had no expected improvement for functional mobility." *Id.*

That same month, Dr. Olinger released claimant to return to "light to medium" work. (T. 30). Claimant did not return to work but was seen her treating physician, Dr. McIntosh, for headaches and neck pain.

On February 23, 2017, Dr. Thomas Jeffcoat, a non-examining DDS specialist (physical) assessed claimant for the following medically determined impairments (MDI): Dysfunction-major joints and Anxiety Disorders. (T. 98-99). He found, with respect thereto, claimant to have a medium RFC but with only occasional lifting overhead with either arm.

In March 2017, Dr. Glenda Scallorn, another a non-examining DDS specialist (for mental) noted depression and anxiety for which she assessed "psychological perspective only, mild functional impairments." (T. 99).

On March 15, 2017, claimant saw Sharon Upton, ACNP, and "complained of **chronic headaches that had been ongoing for a year and getting worse**. . . reported that she was awakening with headaches and had become very forgetful and was having some mental status changes" and **the medications for the headaches were "no longer effective."** *Id.* Upton indicated that claimant would need a **referral to a neurologist**. *Id.*

At or about the same time, Dr. Linda Buck, the only mental specialist who actually examined claimant, noted that **claimant's headaches and related sequela were getting worse.** (T. 36). Dr. Buck noted claimant's limited range of motion in the head and neck, and left arm numbness, severe migraines, neck pain radiating pain down the arm from the neck. *Id.* She diagnosed claimant with "major depressive disorder (moderate) and panic disorder s/p neck/disc surgery, arm/hand numbness, IBS and headaches." (T. 542-46). She also opined that claimant exhibited "poor" sustainability and related reported physical limitations. She found Claimant's prognosis to be guarded. (T. 545).

On April 27, 2017, claimant was referred to a neurologist, Dr. William Owens, who examined claimant and diagnosed "**migraine, cervicogenic headache, cervical spondylosis and memory loss.**" (T. 37) For all of which she was prescribed Topamax. *Id.* She was also prescribed Gabapentin, Roboxin and Elavil but had "**no improvement with the medication for headaches**." *Id.* Dr. Owens concluded that claimant had a "**severe limitation of functional capacity, [and was] incapable of minimal sedentary activity." He further opined that claimant's condition had "retrogressed and was anticipated to deteriorate."** *Id.*

Approximately two weeks later, on May 18, 2017, the claimant returned to Dr. Owens complaining of **headache but noting the same were less frequent (only 4 in the past 3 weeks)** and the multiple diagnoses remained unchanged. *Id.*

The next month she was seen again at Dr. Owen's clinic where she was accessed as **having headaches, now 3 to 4 times a week, lasting on average 24 hours to 2 days at a time.** (T. 31). **Her medication (Topamax) could not be increased, however, because it was enhancing her panic attacks.** *Id.* Dr. Owens referred her to a pain management specialist for her headaches and associated refractory neck pain. (T. 556-57).

The claimant appealed Dr. Jeffcoat's initial DDS determination asserting that **by the spring of 2017 her headaches and related sequala had worsened.** On June 29, 2017, Dr. Carole Kossman, a non-examining DDS specialist reviewed and affirmed Dr. Jeffcoat's initial DSS determination. (T. 105-13).

On September 21, 2017, claimant underwent an **independent medical evaluation by Dr. Fred Pasioon, a neurosurgeon, who noted headaches, with photophobia, nausea, vomiting and he found her to have "severely limited range of motion of neck in all directions."** He took x-rays revealing moderate disc degeneration of cervical spine and posterior osteophytes at c4-5 and 6. Contrary to the representation of the ALJ, Dr. Pasioon did *not* confirm Dr. Olinger's opinion from over a year earlier that claimant could return to light to medium work. On the contrary, this specialist ordered her *not* **to return to work**. (T. 564)

```
WORK STATUS & LIMITATIONS:
Stay Off Work: ___X___.  Return To Work: _____.
Restrictions:
```

5

The following day, claimant saw the nurse practitioner referenced above and whose note on which the Commissioner relies. While the nurse did note, on that occasion, that claimant reported **a reduction in frequency of headaches**, **and that the medications were working well to control headaches and neck pain**, it bears noting that in the same sentence the nurse reported the **claimant needed abortive medication for her severe headaches** and she was prescribed a new medication, Treximet. (T. 33).

Moreover, the next month, November 2017, claimant returned to Dr. Owen's clinic complaining she was **now having *worse* headaches *every day* and along with nausea, vomiting, and light sensitivity**. *Id.* Dr. Owens found that her **chronic migraine headaches were still a problem *despite the use of multiple preventive medications*.** *Id.* She was recommended to have injections for the headaches. *Id.*

The next month, claimant saw Dr. McIntosh for **debilitating headaches neck pain and memory problem associated with medications**. Dr. McIntosh assessed her with failed neck syndrome, tension and migraine headaches, and cervical radiculopathy. (T. 604).

A few weeks later, on January 2, 2018, claimant was referred to and seen by another specialist, Dr. Ravi Pande, also a neurologist. The record reflects **she was having headaches 5 times a week and the meds were *not* helping.** He recorded that the headaches occurred with **associated symptoms such as dizziness and vomiting**. (T. 603). Dr. Pande diagnosed her with headaches and cervicalgia (neck pain). *Id.* He switched her Topamox medication to Depokote. *Id.* Before the month's end, on January 30, 2018, claimant was seen again by Dr. McIntosh who reported that "**he felt her headaches were intertwined with her chronic neck pain.**" *Id.* Claimant reported she thought the new medication was working better than had the Topamax. *Id.* Two weeks later, however, when claimant returned to Dr. Pande as suggested, she reported that **the Depakote**

6

was *not* helping. *Id.* Claimant was seen again by Dr. Pande in April 2018, **still with headaches and neck pain**. *Id.* The next month, she was seen by Dr. McIntosh again. He opined in a letter dated May 4, 2018 she suffered from **debilitating neck pain, radicular pain and headaches**. (T. 602).

One month later, on June 5, 2018, Dr. McIntosh found that claimant reported that "**she has had a headache for the past three days. She has had headaches that have a tension component and a definite migraines component. They are associated with dizziness, nausea, occasional vomiting. She looks horrible today. She is having photophobia, nausea, severe posterior cervical and occipital headache.**" (T. 601) **She was instructed not to operate machinery**. Dr. McIntosh reaffirmed his diagnosis of failed neck syndrome, migraines and tension headaches, and neurological decline. *Id.*

Less than two weeks later, on June 19, 2018**, claimant was again seen for headaches which were now occurring two or three times each week** and it was noted the **Topamax which had been earlier prescribed for her headaches had caused kidney stones.** (T. 35).

A couple of weeks later, in July 2018, claimant was seen again by Dr. Pande for **headaches/neck pain said now to be occurring consistently at two to three times each week.** *Id.*

Finally, she was seen again by Dr. McIntosh on August 8, 2018. He noted "**she is miserable with headaches and that her neck gives her a lot of trouble** or to do any kind of meaningful task." (T. 35)

It is against this backdrop of extensive medical documentation of recurring headaches and associated sequala – for which claimant was seen by medical professionals, including specialists virtually every month, or more, and for which she was prescribed non-stop (but changing)

prescription medications, including Depakote, and on account of which she was instructed by examining specialists (to include an independent examining neurological specialist) to remain off work, that the ALJ found her headaches and related sequela to be non-severe and medically controlled.

"[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)). While the undersigned is certainly cognizant that it is not the role of this court to reweigh evidence, it is the role of this court to ensure there is substantial evidence to support an ALJs decision. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and internal quotations omitted). It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater,* 67 F. 3d 552, 555 (5th Cir. 1995). Under the substantial evidence standard, the agency's findings of fact are not conclusive if any reasonable adjudicator would be compelled to conclude to the contrary. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020). Finding no substantial evidence is appropriate if no credible evidentiary choices or medical findings exist to support the decision. *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

In the view of this court, there is no substantial evidence to support a finding that claimant's headaches and related sequela were non-severe or insignificant due to effective medical management. While there may be a nurse practitioner's note of some improvement in claimant's headaches and medical management on one occasion, the medical history, as plainly demonstrated above, describes a significant, deteriorating and debilitating medical problem. Any reliance by the

ALJ on the non-examining DDS determination to support his non-severity finding is misplaced as the DDS non-examiner assessed only the following medically determined impairments: Dysfunction-major joints and Anxiety Disorders. (T. 98). Moreover, the non-examiner assessments were made without the benefit of all the records, including those of specialist whose records contradict them.

Nevertheless, the Commissioner argues that any error in assessing the headaches and related sequala as not severe was corrected in the RFC wherein the ALJ limited claimant to simple, routine and repetitive tasks. But there is no explanation – nor is one evident – of how such limitation would accommodate the frequent occurrence, despite medication, of what claimant's treaters, to include Dr. Owens and Dr. McIntosh, described as "debilitating" headaches occurring consistently, often multiple times a week over two years and despite medication which rendered her incapable of operating machinery. Nor does it address the related sequala of nausea dizziness and inability to move the head/neck in any direction. In short, while it is accurate that a step two error may be cured by an ALJ at Step 5 provided that the conditions that were erroneously assessed as non-severe are nevertheless accounted for at step 5, that is simply, demonstrably, not the case here.

This case is remanded for reevaluation by a medical expert of the entirety of plaintiff's medical records for the relevant period and a re-assessment of claimant's disability status based thereon.

**DECIDED** this, the 19th day of April, 2021.

/s/ Jane M. Virden

**UNITED STATES MAGISTRATE JUDGE**

9